Michael J. Parker The Workers' Compensation Commission If it pleases the Court, Counsel, I'm Christine Orry, representing the Appellant David Thomas, the Petition on the Workers' Compensation matter. I apologize for not being here when the Court took the bench. I know better now to take the train. The issue before this Court is not whether Mr. David Thomas is entitled to the Second Injury Fund because he has 100 percent disability to both eyes, but when. The matter is before you both on the arbitration, hearing, and our 19-H petition. The Industrial Commission, the Workers' Comp Commission, excuse me, did not take into consideration the injury to Mr. Thomas' eye. What he took into, what they took into, or the standards set forth by Lambert, Walker, the Gilbert and Chughar Painting Company, but whether or not he had a driver's license. I suggest to this Court that if we were here before you on an administrative hearing as to whether or not Mr. David Thomas should have a driver's license, he probably should not. But they clearly, especially in the 19-H hearing, stated that he had only a 90 percent disability to his left injured eye as a result of the work accident only because he still had a driver's license. What's wrong with that? What's wrong with that? We don't know the basis upon which he... You don't know the basis of what? We do not know the basis upon which the Secretary of State issued the man's license. At one point he testified that he just called in. We have no evidence to support how he obtained his license. Although we did try to get the information, I do not know how the man has gotten his license. But if you look at the injury to the injured eye, the left eye, clearly hand movement is the only visual acuity he has at the time of the filing of the 19-H. Clearly that is 100 percent of an eye. What was the status of the eye prior to the first injury? I'm sorry, I didn't... What was the status of the eye prior to the first injury? Prior to the injury, you're talking about his left injured eye? Yes. His visual acuity was 20-20 corrected, 20-200 uncorrected. After the injury, the closest that he came to is approximately 20-70 at the time of the arbitration hearing. At the time of the 19-H proceeding, his best was hand movement. Clearly, by all standards set forth by the courts, this man has a 100 percent disability to the left eye as a result of the work injury, at minimum, at least at the time of the 19-H filing. It's clear to disregard the evidence. They can, I would have conceded to the court that the court could take into consideration the fact that he may have a license, but I don't think that they should base it upon the fact that the man still is driving. He probably shouldn't be driving. He talks about how he drives. He's held on to his license mainly because his wife is also legally blind. He has it, but he does not drive. He can't even read street signs. He's not driving anymore? I do not know at this point. I don't even want to ask him. I don't want to go near his home. What did the commissioner mean when he said that the claimant had to submit a form from physicians in Iowa City that showed the visual acuity in both eyes? He did testify to that, and if you look at the record, I did try to subpoena from the Secretary of State as to what form was completed, and that was not provided. They could not find the form. I don't know what standard. He testified that in order to get the driver's license, he had to give a form from physicians. At one point in time, that's correct. That's correct. I do not know what it was. I do not I have no indication as to how the Secretary of State works. If that was true, though, if the Secretary of State's determination that the man was okay to drive, as far as whether or not he's disabled, then my job as the petitioner's attorney would be easy because I could just go to the Workers' Comp Commission and say, my client, as a result of the work accident, the Social Security Administration has now said that he's disabled. Therefore, you should be awarding Well, I don't think that's what the commissioner was saying. I think the commissioner was saying that he submitted in 2003 reports from doctors in Iowa City that showed visual acuity in both eyes, and as a result of the reports he submitted, the Secretary of State renewed his driver's license. That's what he testified to. Although he did testify that he just called in because he had a good record and was able to renew it by just calling in, because he had a good driving record. Well, he didn't submit a form, did he? He did at one point in time. That's correct. Did he submit it when he renewed it in 2003? Excuse me? Did he submit it when he renewed the driver's license in 2003? I don't believe so. But he may have done that, but the issue then becomes, what was his visual acuity at that time? At the time we filed the 19-H, his visual acuity was at hand movement. So he probably should have had his driver's license revoked at that time, because his amblyopic right eye from birth was 2200, and now his left eye is hand movement. I think it's a red herring. It's a red herring to say that But we're talking about strictly just the loss of an eye. We're not talking about the fact that he works for the same company, doesn't he? And that's correct. He still, he was, he no longer is, but Excuse me? Well, that's not relevant. That's what I said. That's correct. We're talking only about the loss of an eye. That's correct. Not the fact that his income has increased. That's correct. And his job is a possibility to improve. That's correct. I think those are the two red herrings that the commission looked at. They looked at whether or not he was still working, and whether or not he had a driver's license. They did not look to the injury of the man's eye, which is the left eye, clearly, at the time of the 19-H filing, that he had 100 percent disability to his left injured eye, because he only had hand movement, and the right eye was clearly at the, was 100 percent disability from birth, because that even corrected was $2,200. The loss of the use of an eye is a question of fact to be determined by the commission. Is that correct? That's correct. All right. So where is an opposite conclusion fairly apparent? They ultimately decided that because of, as I understand, the additional left eye surgeries, his disability was, in fact, increased 90 percent. You say it should be 100 percent. That's correct. Releasing it to simplest terms, those are the competing arguments. So why is their finding against the manifest weight 90 versus 100? Why is it against the manifest weight? Because I suggest to you that if a man has hand movement, plus the fact that he has this severe injury to his eye, and it's listed in the brief as far as the corneal transplants, the retinal detachments, all the surgeries a man has gone through, when you have a person by any standard that has, can only see hand movement, which is less than 2,400, that is 100 percent disability in eye. And for them to say, the commission to say that he had a 90 percent, because he has a driver's license, as I indicated, they turned the blind eye to the evidence. They did not look at the injury itself. How can you say a man who can only see hand movements doesn't have 100 percent of an eye? How can you say a man who has a driver's license can't see at all? Doesn't that seem to be an inconsistent argument? That's correct. But I don't know how he got this driver's license. Didn't he also testify that he still drives the car on rare occasions? He did. He does. Well, how do you drive a car if you're totally blind? I don't know. I wouldn't want to ride with him. Don't you think we should ask Commissioner Rink? Because he is totally blind. I understand that. And Commissioner Rink said 90 percent of an eye. He didn't say 100 percent of an eye. Now, don't you think a man who is totally blind should understand the difference between total loss of vision and only partial loss of vision? I don't think if you looked at the evidence, again, we don't know when he submitted the forms, how he got his driver's license. He testified that he drives the car on rare occasions. Right.  I don't know. What do you do? Does someone tell you how to aim it? I mean, I don't understand how that could be possible. I believe he testified that he drives it from his home to the grocery store on Sunday mornings when there's no vehicles on the road. But he has some vision. He has. How do you maintain it has to be 100 percent when he drives a car? It's against the manifest way of the evidence for the commission to find that there's some vision there that allows him to drive. It has to be 100 percent. It can't be 90 percent. The problem is, is that we don't know what the standard that the secretary is stating. Let's put it on the car, because I think the car is totally a red herring. I agree with counsel here. We do have medical evidence here that says there's hand movement. So the real question is, is reducing your vision to hand movement only, is that compensable at 100 percent? And I suggest that it is. The car, we don't know what standards they use, but that's the medical evidence. That's correct. So we focus on the medical evidence. Exactly. And your argument is, when you get to where you can see only hand movement, you should lose a, you should be compensated at 100 percent, right? That's correct. What basis, what case law authority do you have to support that argument, that conclusion? This is your opinion, correct? Right. Where in the case law does it support that conclusion framed in the issue that Justice I believe in Gilbert and Chughow and the cases of Walker and Lambert that said that if it's less than 2200, that is industrial blind. Dr. Weinberg stated that was industrial blind. In fact, Dr. Weinberg stated that 2070, when he, which was his vision, that was before the arbitration hearing, said the man was industrial blind. By Dr. Weinberg, MCI's doctor, he should not have gotten a driver's license. We're back to this driver's license. I'm sorry. Let's get off of that. That's right. But what I'm saying to you is that's a This is an industrial commission court. That's correct. So we have a concept called industrial blindness. That's correct. Okay. And that is 2200. So that's what we should be focusing. That's 2200. That is, according to all the cases, Walker, Lambert, they say 2200. And when you have a man that has hand movement at less than 2400, that is clearly industrial blind. How do you get around the case of Pridgen v. The Industrial Commission, which holds the loss of the use of an eye is a question of fit? It is not one to be determined by mechanical measurement as to corrected or uncorrected vision that you are hanging your hand in? Well, the corrected vision is still hand movement. It's still, anyway you size it up, he still has an industrial blind, industrial blindness. Based upon the injury to the eye and that, according to even a Pidgen, I believe it's a Pidgen, that is 100% disability. The commission just missed it. You made that argument below and the commission just missed that argument. I believe they did. I believe they did. I'm not to beat the dead horse, but the Secretary of State issue, they clearly stated it. So that's what I've been arguing all along. Everybody seems hung up on the fact that they had a Secretary of State without looking at the evidence. And I'm asking that this court look at the evidence and you'll find that the manifest weight shows that the man is industrial blind in the left eye and has been blind since birth in his right eye. What they hung their head on was that the petitioner is still driving. That's what they hung their head on. Right. They said further, they note, that he renewed his driver's license. So it's not a red herring. It's the basis of their finding. The basis of their finding is that he doesn't get 100% loss of use of the eye because he is still driving. Now, the question becomes, is that legally unsound? I believe that this court is not bound by the Secretary of State's findings. Licensing. Licensing. Pritchard is, Pridgian is clear. Use of an eye. We don't care about, you know, we used to not even issue licenses until 32 in this state. Okay. So people drove. Okay. Right. So now the question is, driving, is it an activity that requires the use of an eye and is that sufficient to overcome industrial blindness? According to Pridgian, which is stating it's not mechanical measurement, it's use of an eye. Whether there's a loss of the use of an eye. And I would suggest that it is still industrial blind because of the, if he did drive, I think he dies more by feel. And therefore, I don't believe that he is not industrially blind in both eyes. Thank you. Thank you. We have time for one more. Counsel, please. Good morning, Justices. Terry Donohue on behalf of the respondent, MCI. Justice, there are two matters before the Court. The first is from the initial arbitration. Are two of you going to argue in response or only one? Two of us. How will you split the time, please? Evenly. Seven. What was the time again? Seven. Seven and eight. All right. Justices, again, there are two matters currently pending before the appellate court. And in the first matter, the respondent, MCI, submits that the commission was correct in awarding 75 percent loss of use of the left eye after the initial arbitration. That decision should be affirmed and was not against the manifest weight of the evidence. Obviously, we have a subsequent hearing under Section 19H for further evidence was submitted about further complications and procedures to his left eye. But nonetheless, we still do have the earlier decision, which we believe was not against the manifest weight of the evidence, which was presented at the June 14, 2001 hearing. The opposing counsel seems to indicate this is a fairly simple case. What is your response to the argument about industrial blindness? Clearly, there is a standard that he has met. Forget about the discussion of driving. Forget about the driver's license. It's a simple case. The standard of visual acuity that he now possesses means he's blind. He should get 100 percent. Why is that wrong? Well, my response to that is there is no authority that the Wisconsin eye chart or any other measurement is dispositive regarding loss of use of vision. That's the province of the Industrial Commission. And it involves the use of the eye, however the claimant may use it. And in this instance, we appear to have evidence that the commission relied upon that the petitioner was, in fact, driving. He was driving in 2006 at the subsequent 19H hearing. So you're making a very logical argument. You're saying that for somebody to be granted 100 percent loss of the use of an eye, if they're, by their own admission, driving a car, it's a logical non sequitur. They can't have lost complete use of the eye if they're driving, you're saying. Well, in addition to that, he was continuing to work as well. So that's another factor, another real-life use factor. Well, what was his job? I mean, there are lots of blind folks' work, so. I'm sorry, Judge? You're going to have to show something about his job that articulates the use of an eye, because blind people do work. That's correct. Well, he testified that he continued to work. He did not testify that the left eye prevented him from work. Well, let me get back to the point. So what? I mean, you know, there are blind people who work, so what does working, per se, have to do with the use of an eye? You've got to talk about what is the nature of the work and whether you can infer from the nature of the work that there is an eye that's actually being used. Well, the nature of his work was that he worked on a computer. Now, he did have a larger screen, but he was able to function with that, and he did field phone calls, and he did travel, and he met with people. He actually phone calls blind people can do, blind people can travel, but you've got one here that you could infer logically involves the use of an eye, and that's the computer, right? The screen. That's correct. And, by the way, you know, I would submit that the commission only gave him 90%, you know, so it's not as though they're saying he is only injured to 50% or it hasn't impacted him. They've gone all the way to 90%, and they're saying that this use that he makes in continuing to work and using the computer and in driving and in apparently submitting to the Secretary of State medical forms that indicate he has the ability to drive, and those forms apparently touched upon both eyes, that that's enough for the 10%. And you're saying 90% is too high, correct? I'm saying the decision should be affirmed at 90%. 75%. I'm sorry? At what percentage? At the 90% which the commission awarded. In the earlier proceeding, there was only evidence to support the 75% loss, but at the subsequent 19-H proceeding, I believe that the 90% award is not against the manifest weight of the evidence. It is supported by the record as we discussed. You touched on two points. You had a lot of questions. One is the fact that he's driving by his own admission. Two is the nature of his work, as Justice Holmes points out. As a matter of fact, his working isn't as positive. It's the actual nature of the work. What else reduces it from 100% to 90%? Is there anything else? Well, I don't think those things are insubstantial. The fact that in his daily life, he is able to function at work and is able, I believe, probably the main means of his communication is through looking at a screen and exchanging e-mails and so forth. I mean, I don't think that's insignificant, and all we're looking for is 10%. You know, he's traveling. He does a lot more traveling than many people do and is interfacing with people and getting places and meeting people, and apparently, you know, he's able to do that. He travels to a lot more than most other people, so that's still not an issue. I mean, I don't know. Thank you, counsel. Your time is up. Counsel, please. Good morning, Your Honors. My name is Jan Hughes, Assistant Attorney General on behalf of the State Treasurer. I don't want to repeat the arguments that were just made by my co-counsel, and I would just ask this Court to find that the decisions of the Commission were against or not against the manifest way to the evidence. I would, however, like to address the issue that, you know, that MCI has brought up, and I think Mr. Thomas has too, whereas if this Court would reverse and find that there's 100% loss of the left eye, what to do in that case? And our position is that the Commission has never made any findings about the loss of use of the right eye. And this Court, if it would find, and I hope it does not, that the loss is 100% in the left eye, then the proper course of action for this Court would be to remand it to the Commission so that findings can be made. This is a court of review, obviously, not one to make findings in the first place. So that would be what we ask. And the alternative to that, if this Court would reverse the Commission and would decline to remand it, we would ask this Court to find that there was not a complete and total permanent loss of use of the right eye. And I think I was looking at the reply brief earlier this morning, and I think that there are things in the reply brief that support that position. On page 5 of the reply brief, Mr. Thomas has said that the right eye is better than the left. On pages 4 and 8 of the reply brief, Mr. Thomas has said that the right eye has improved. And certainly if we're looking at a permanent loss of vision and there's been improvement, I don't know how a permanent loss could be found. NCI, on page 24 of their brief, refers to a few aberrant readings of the right eye of 2070. And again, I go back to the reply brief, and I think that the position that Mr. Thomas has taken and sets out kind of a chronology of the eye readings shows that the right eye is not total and permanent and complete loss. In 2001, it measured 20 over 80. In 2002, it measured 20 over 80. In April of 2003, it measured 20 over 70. And at that point, the left eye was 20 over 80, so it was better at that point than the left eye. In August of 2003, it was 20 over 70. In 2004, it was 20 over 70. And in 2005, it was 20 over 60. And so our argument is, I believe, very straightforward. And we would ask this court to affirm the commission's finding of a 90 percent loss of the left eye. If this court for some reason would reverse that, we would ask for a remand for the commission to make the findings on the right eye. And then the alternative, if this court would decline that, would find that the right eye did not have a total, complete, and permanent loss, and therefore the second injury fund would not be liable for one cent in this case. Now, how do we ñ on what basis do we make that finding a fact in essence? I'm sorry. Could you speak up just a little bit? Well, you're saying if this court would reverse the commission's decision and decline to remand the matter, you ask us to find that Thomas failed to prove he had a preexisting permanent and complete loss of the use of the right eye, correct? Correct. Is it appropriate for us to make that finding? We would ask that it be remanded to the commission to make that finding. The argument is just an alternative one where if this court for some reason would decline to remand and believe that there was enough evidence in the record to make that finding itself. But again, we would ask that it be remanded. The commission is the one that should make the finding. And the commission made no findings regarding the right eye. Thank you very much. Thank you, counsel. Roberta, please. Just briefly, as to the issue concerning the use of the eye as it relates to driving, I would suggest that as the petitioner testified at the time of the 19-H hearing, he was driving very minimally, and I would suggest that that is not for purposes of use of the eye at work. And also, counsel had indicated that he was still using a computer screen, but since the 19, before the 19-H hearing, since the arbitration hearing, he was provided a magnifying computer screen in order to perform his function. And so therefore, he was able to compensate. And I don't think a man who continued to work despite his disability should be penalized, nor do I think anyone who is not properly injured should be awarded. But as I've indicated, I think that if you use the term driving, I think in his case it's very loosely used because it was very minimal in order to get groceries for his family because his wife was also legally blind. Thank you. Thank you, counsel. The court will take the matter under review.